Case number 201491, 201492, 201515, and 201522. Mr. Quigg for the first appellant, you may go first. Good morning, and may it please the court. My name is Charlie Quigg, counsel for appellant Daryl Summers. I've reserved two minutes. The District Court committed several errors in this factually and legally complex drug conspiracy case. I'll focus this morning on the District Court's most fundamental error, it's denial of Summers' right to cross-examine the government's witness about his incentive to shade or fabricate his testimony after he learned that the government knew about his creation and possession of child pornography and criminal sexual conduct. This is shared by what, all defendants? Three of the four defendants, yes. While the District Court has discretion to limit the scope of cross-examination, the confrontation clause does not allow it to bar the door entirely to questioning about events that concededly took place and could establish the witness's bias, as it did here. Was this significant because the activity was a crime, or was it, as the judge said, just embarrassing? Neither, Judge Donald. It was significant, but the fact that it was a crime in itself had little bearing on the case. It might show that Stovall was a bad guy, but there was plenty of evidence already in the record that Stovall was a bad guy. Basically, it was prejudicial in that respect. Really, as bad as it was, it doesn't really go to honesty, necessarily, directly. The simple fact that he committed a crime, you're exactly right, Judge Tosledge. It does not go directly to his characterful truthfulness. However, the government disclosed not only that it discovered this evidence, but that it disclosed its knowledge to Stovall. In fact, it asked Stovall about it, and he admitted his misconduct. That's the critical distinction between the simple fact that he created and possessed child porn and committed criminal sexual conduct. Well, what I was getting at before, though, you said that it was prejudicial because the Was there some explicit or implicit forbearance or prosecution on possession of child pornography, which is a federal crime that has pretty severe penalties? Is that the thing that you say he was prejudiced by not being able to explore this? In part, Judge Donaldson, I'm sorry. I misunderstood your earlier question. I thought you were asking whether the evidence coming in could be prejudicial to the government or prejudicial to Stovall. Are you talking about Mr. Summers? Yes. Thank you, Judge. Yes, prejudicial in a variety of ways. The government has represented that it didn't have any deals with Mr. Stovall, and fair enough. We take the government at its word. But we know that the government discussed this issue with Stovall, and in those discussions. The jury knew when Stovall testified that Stovall had been engaged in a number of illegal actions, some of which were being prosecuted. So why would the child pornography on his phone be so important to your side to show the weakness of Stovall as a witness? Well, it provides another significant incentive for him to shade or fabricate his testimony in favor of the government. Number one, the government may have made statements to him to make him think, regardless of whether there were any deal, the government may have made statements that made him think there was some light at the end of the tunnel if it was happy with his testimony. And in fact, we don't know what was said because we couldn't ask him, but it does bear mentioning that he has never been prosecuted at the federal or state levels for these crimes. I think if, I mean, what was the case where the guy was like on juvenile probation or whatever? Was that Davis? Davis, yes. Okay. I mean, I think your argument could, I mean, would really be quite serious in a case where, say, the witness is on probation and faces like a supervised release type violation charge. And the jury's not aware at all of that fact. And they're forbearing from a supervised release violation prosecution, for lack of a better phrase. But Stovall hardly comes into the courtroom with that kind of relatively clean slate. And I mean, isn't it true that the jury knew that he would have been facing a life sentence for his conduct if he hadn't, you know, basically, period. Isn't that, wasn't that brought out in cross? No, Judge Kethledge, but at the time of trial, he was not facing a life sentence. But that his conduct would have subjected him. In other words, if you're trying to impeach him with the idea that he's testifying favorably to the government to get a shorter sentence, weren't, I thought they were made aware that he could have been subject to a life sentence, but he's not because here he is testifying, basically. I think that's largely correct. By the time of trial, the First Step Act had been passed. So I don't think it's true that he was facing a life sentence by the time his plea actually was entered and certainly by the time of sentencing. But those facts came out. There's no, there's no doubt that there was some discussion of that on cross. But setting that aside, I think it's important to keep in mind that whatever the charges, I mean, these would be serious charges and there was at least a possibility that his sentence could face a longer sentence either because of a state conviction or federally. But setting that aside, Stovall testified that he was a man of some social standing in his community. He cared about his family. And I think we all can recognize that there's a significant stigma associated with conviction for child sex crimes. And not only that, he was facing a long sentence in any event. And he may have feared the prospect of going to federal prison labeled as a child molester. Suppose we agreed with your position. Would this be a reversible error? It would, Judge Moore. So analysis is two-step. Question number one is, was there a violation of the Confrontation Clause? If you agree with me there, the question is, can the government show beyond a reasonable doubt that the error was harmless? Our position is no. The government's case was quite thin without Stovall's testimony. Stovall was the only person who testified directly that Summers was a member of the conspiracy charge in this case. The government presented testimony from a couple of other co-conspirators that Summers purchased and sold drugs on a handful of occasions. That testimony at best weakly corroborated Stovall's testimony. And even that weak corroboration would have been weakened by the fact that the three of them, Stovall and these two other witnesses, were locked up together from the time of arrest with a copy of the government's complaint. The defense was able to cross Stovall about the fact that the government thought he put a hit on two people who were in fact killed. Is that correct? Yes, Your Honor. I understand the frustration of the defense, but on the one hand, the jury already knows that he's basically testifying. As a result of his testimony, he's avoiding a much longer sentence in all likelihood. They know that, and in terms of social standing and so on, they at least are going to have a strong suspicion that he put a hit on two people. Doesn't that substantially cover the bases of impeachment that you're concerned about here? No, Your Honor. Our position is that this impeachment would be qualitatively different. At the end of the day, who knows if the jury would have disbelieved Stovall had this evidence come in. But that's not the standard here. It's not our burden to show that. Our position is it's impossible to conclude that the jury would have made the same decision had this evidence come in and the jury disbelieved Stovall, which is the standard of review here. Okay. Thank you. Thank you. Good morning and may it please the court. My name is Sarah Howard. I'm here on behalf of Tremaine Braxton, one of your appellants in this case. I was also the trial court counsel for Mr. Braxton. I'm reserving two minutes for rebuttal, please. I am relying on my brother counsel's discussion of the violation of the Confrontation Clause issue that he just discussed, and I am addressing three different issues. Three of the other errors in this trial, which require reversal of the district court. I am discussing the court's error in denying a one-week adjournment after the government produced 10 hours of video and audio proffers and more than 3,000 jail calls a few days before trial. I'm discussing the court's error in permitting the government to play unreliable audio recordings and its interpretation of those as transcripts with respect to my client. And I'm also discussing the court's error in authorizing the wiretaps because of what we feel is a lack of sufficient showing of necessity for the wiretap authorization. With respect to the denial of the one-week adjournment, under the factors that were identified by this court in Powell v. Collins, we think there was no other option but to grant a short adjournment under that test and that it was an abuse of the district court's discretion to deny the one week. This was material produced pursuant to the Jenks Act? That's correct, Your Honor. And you would agree they produced it earlier than the Jenks Act required? I would agree, Your Honor. And the Jenks Act talks in terms of past tense. You have to produce materials as to which the witness, I think, has testified. Yes, Your Honor. So wouldn't it be pretty extraordinary for us to say a district court abused its discretion by failing to adjourn a trial where the government produced Jenks Act material earlier than the act required? It would not, Your Honor. It would not? Can you cite a case where we did that? I cannot cite a case where you have done that, but you should do it here, Your Honor. Due process requires that the defense have at least some adequate time with the material in order to be able to effectively use it on cross-examination. If the government had handed it to me as I was walking up to the podium to cross-examine, the judge would have to give me some small amount of time to review it at that point. But because we want efficiency in trials, we don't want to waste the jury's time like that. Typically the practice is it is given early enough for it to be usable. Here we are talking about only an additional week in a case where my client was facing a mandatory 15-year sentence. I'm sorry, go ahead. So I'm curious, have you had time subsequently to look at these materials, to listen to these materials, and have you identified anything that you would have done differently? Or is this something that you would have to show on a 2255? I believe it's something that a defendant would have to show on a 2255, Your Honor. During the trial, there is not sufficient time to be able to effectively listen to this and use it. We knew essentially what the proffer statement would say, essentially. But the problem is to be able to effectively use those in cross-examination, we needed to either have them transcribed or have video clips available to impeach the witnesses when they in fact did testify at odds in important respect with what was in the proffer statement. The other issue is that you can't effectively put together a defense in a case of this nature, particularly a drug conspiracy case where we're talking about typically one person who is cooperating with the government and who is supporting other relatively weak objective evidence against the defendants, to be able to put the entire picture together and know the entire picture by listening to the differences in the statements. There's no way to effectively use it. Judge Kessler just asked you about precedent in this circuit. Are there any cases from other circuits or any district court cases that you found where a continuance has been granted? I'm not able to give you any right now, Your Honor. But I think that given the fact-specific nature of the inquiry that you have to make when you're deciding if an adjournment is appropriate, I think that this case presents a very clear situation where that was required here. The other issue is... There was about 10 hours of audio and video interview type stuff, right? Yes, Your Honor. And believe me, I've tried even a criminal case once, and I understand what it's like to be in trial mode. And now you have 10 hours dumped on you. But it's 10 hours. You had eight days, right, before these witnesses testified. Isn't that right? Well, no. I mean, I would have had one day before an unknown slate of witnesses was going to testify first, and then I had two days before the next slate of witnesses was going to testify. So, I mean, in theory, I had to be ready for every single witness on the first day. Right. But these witnesses, I guess, they're witnesses to whom this material related testified like a week later, right? Yes. I'm not sure that's true, but, yeah, it was three or four days, Your Honor. I do sympathize, but I'm struggling to see how we can say that's an abuse of discretion. It was so out of bounds. Counsel, I wanted to ask, on the 3,000 jail calls, is that also a part of the 10 hours, or are those two separate categories? Separate categories. Okay. And then what about the, was it 1.5 gigabytes of something? Are these calls and the videos included in the 1.5, or was that something else? That's included, Your Honor. So, for our purposes, there's about 10 hours of audio and video of proffer statements and 3,200 or so jail calls that were provided. So there was no other paper evidence that was given to you at that time? Not at that time, Your Honor. Okay. Yes, Your Honor. All right. And it's particularly problematic here also because of the inability to review any of it with my client and the inability for him to review any of it prior to going to trial. So he was in custody? Yes, Your Honor. Did the jail calls all involve your client, or were a number of other people making jail calls? There were a variety of jail calls, Your Honor, involving a variety of people. The mere process of figuring out which ones had my client and listening to a reasonable sample of them wasn't something we could undertake at that point. It just wasn't an effective use of time. And the purpose of the calls being introduced was to show who was speaking as opposed to the content of the calls? Is that right? The government provided them, Your Honor, with the intent of these are among the calls we would play to demonstrate that this was your client's voice, depending on if we need to, after the agent has testified that he can identify your client's voice. Okay. So one of your other issues was the unreliable audio tapes. Yes, Your Honor. And the transcripts were prepared by the government to aid in people who were listening to the audio tapes to understand what was being said. Did you point to any areas where the transcripts were inaccurate? We pointed to areas where they were unintelligible, Your Honor, where it was impossible, given the quality of the audio and the diction of the speakers, to be able to understand sufficiently that that is what was being said. So did the transcripts say unintelligible then for those portions, or are you saying that the transcripts gave words when there were no intelligible words there? There were instances of both, Your Honor. There were many instances of both, Your Honor. Most of the portions of the calls that were played by the government were limited to the portions where the government said, this is what we believe you can hear what's being said and not the entire length of the call. But the jury was told that they were to use the audio as evidence, and the transcripts were there just to help them understand. Is that right? That is right. The court said these are sort of like subtitles in a foreign movie, and that's how you can tell what's being said. Most of the time, though, with subtitles, we have a generalized understanding about what language means and a general agreement that this is French to English, Spanish to English. It's not the same with a government interpretation of what is being said on these calls, which are incredibly poor quality. Is it your concern, then, that the transcripts have the effect of, I guess, almost bolstering or presenting to the jury what may have been the government's interpretation of language? I'm just trying to understand the prejudice. And I understand that if the evidence are the speakers, and you've got this other thing in there that basically says this is what they're saying. I can understand your concern about that, but what's the bias? What's the prejudice? They became the evidence, Your Honor. They were a – had the jury been listening to the audio, there's no way they would have been able to understand the conversation that was alleged by the witnesses. They became a way of saying this is our presentation. It was a demonstrative that became evidence, Your Honor, particularly when used with my client's picture, with my client's name, when that was still a contested issue. And given the district court's own discussion of how hard these were to understand, even with the transcript, and several government witnesses say you were obviously having a hard time – the callers were having a hard time understanding each other in some of the calls. So the general quality of both the audio and the use of the transcripts here were sufficiently problematic, particularly given how central the role of the calls were to this case. But unless you've identified something that was mistranscribed, you know, got the words wrong, or they're making up words where something was unintelligible. I mean, what's – all that said, it remains an aid for something that was difficult to understand but is understandable. It's either an aid or they were making stuff up. Well, I can't say what they were saying, Your Honor. I can't say if that's the actual word or not because it's not a word I – there are several instances where you simply cannot understand it without having – without someone saying this is what they said. In your view, they put words there anyway? Is that what you're saying? Yes, Your Honor. Okay. Anything especially prejudicial along those lines? Well, the fact that the calls were available to bolster and back up what Mr. Stovall was saying and what other witnesses who relied on Mr. Stovall were saying. Without the calls, they simply had these seriously prejudiced witnesses saying that this was activity that my client was involved in, but they didn't have any other hard evidence for it to back up what these witnesses had to say. Don't you have to tell us that such-and-such a call was unintelligible, but the government transcript says something particularly devastating to your client, and then have us listen and look at that particular statement? But making a general statement seems to be a hard position for you to take. I don't think so in this case, Your Honor, given, again, the nature of the government's case and the way in which they relied on these particular calls. Okay. I wanted to ask you, what is your best case for the proposition that the court erred in admitting the transcripts as an aid to the jury in the case instead of just letting the jury listen to the audio tapes? Probably the Robinson case from this court, Your Honor. Again, there is no discussion there that there was one specific call where listeners could disagree about a word or an expression or something that was said. Again, the discussion there is about the general quality of the calls themselves and the problem with the transcripts in that case, Your Honor. We've taken you way over your time, but thank you very much. Thank you, Your Honor. Good morning. May it please the court. I'm Tim McKenna, and I represent Mr. Cannon. I'd like to reserve two minutes, please. Fine. Your Honors, for Mr. Cannon, he has several errors. I'd like to—the first, I think, is legally interesting,  The case that Mr. Cannon was charged with, the trial court added two points onto his base offense level to increase the punishment in the guideline range. This obstruction says that under 3C1.1, if the defendant willfully obstructs or impedes the administration of justice, increase the level by two. The problem with this is it almost precludes any defendant from testifying if they have an alternative explanation to the theory of the case presented by the government. This is not a situation where Mr. Cannon got up and said, I gave a false name to the police officers or denied going to California. A significant part of the testimony on the government's case was how often people went to California to allegedly buy drugs. Mr. Cannon testified and provided an explanation that he had a food truck, and that was one of the reasons he went to California. There's nothing in the record that says he didn't have a food truck. So when you add these two points to the calculation, he's almost getting punished twice because the jury has already determined veracity. The jury already decided guilt, and now we have the court adding on two more points. In order for the district court to give this enhancement, I believe that under our law the district judge has to make specific findings about the perjury that was involved. What did the district judge specifically say was your client's perjury? Your Honor, the trial court gave an interesting statement. He said that everyone has the right to testify, but you can't commit perjury. Then he goes on to specifically say, if you're going to stand not simply relying on the presumption of innocence and sitting quietly but affirmatively assert I wasn't involved in this, when in fact the jury finds you did and you go beyond that and try to articulate an alternative narrative to explain the evidence about the food truck business, there has to be a penalty. So he specifically mentions the food truck business. But there was nothing to say contra that he didn't have a food truck business. He testified, Mr. Cannon testified that he had a food truck in Michigan. It didn't work. He had family in California, so he went to California. But was he testifying that he went to California to do the food truck and nothing else? He certainly did not acknowledge he was doing anything with methamphetamine, Your Honor. But the punishment for that would be to punish almost any defendant. Any defendant is not going to get up on the stand and say, yes, I sold drugs. It would almost be a chilling effect to testimony. Certainly you're not allowed to commit perjury, but the defendant is allowed to provide his explanation of the facts. But if it's demonstrably refuted by the evidence in the case, then the judge has a basis to say the defendant committed perjury. Well, in this case, though, the testimony of the government is primarily relying on co-defendants, cooperating witnesses. I mean, he certainly has some basis to stand up and say, I did the food truck without commenting on the drug sales. But was he cross-examined? I mean, when he gets up and testifies and says, I was going to California because I had this food truck business or I was helping with the food truck business, does he ever say, and I did not deal with methamphetamine? And that could happen during the cross-exam as well as on direct exam. Because that would be possibly a specific kind of problem that the district judge could have pointed to. During his testimony, he made the statement that I'm the lean man, not the meth man. He postulated that he sold lean, meaning Percocet, and did not acknowledge that he sold or dealt in methamphetamine. If there was a problem with his testimony, perhaps that would be it. But still, no defendant is going to get up on the stand if he is testifying and simply say, I sold drugs, regardless. So when would it, for a testifying defendant, when would the instruction based on perjury be appropriate? If they, the case law says it would have to be denying a material fact, and I would suggest if he completely denied being in California when he was in fact in California, they had that with the airplane tickets, or if he gave a false name or something like that. When you're talking about the actual elements of the offense, that is what is at issue. The defendant has to be allowed to get up on the stand and testify to his version of what happened. Certainly can't commit perjury, but they have to be able to testify. Is there a different standard for evaluating perjury for a testifying defendant and a testifying witness? And what I'm referring to is I know there was an allegation of perjury on behalf, I believe, of Mr. Stoball who said on July 11th or 22nd or whatever, you know, I, somebody, MIMS or somebody came, he told MIMS, I don't have any drugs. And then on another occasion he said, well, on whatever that date was, I just told him I didn't have any drugs because I did not want to sell him any drugs. And there was an allegation of perjury, but in the courts it was known that that's kind of not perjury. Is there a different standard? I don't know that there's, I'm not aware of a legal standard, Your Honor. I can tell you, I would suggest practically from doing trials that there's one thing to have a faulty memory where you may think of something differently. Was it, do I remember a specific day, yes or no, versus, again, I'll use the false name. That's not my name or I never even saw that person. I think that would be a practical determination by the jury in trial court, which I believe is why this is an abuse of discretion issue because of that, because it's, you very much have to watch the witness as they testify. I would also suggest that the court, along this same topic, that the court did not make a sufficient finding, even if this court was to find that he did obstruct justice. This court has previously said the court has to determine the defendant gave false testimony concerning a material matter and that the willful intent to provide false testimony, that it was willful rather than confusion or mistake or faulty memory. I just read the court, to this honorable court, what the district judge had said. I don't think that's enough to make those findings. What did he omit? He didn't actually say what was materially false, and I go back to the food truck, your honor, because there was nothing to say he didn't have a food truck. The court, or during the testimony, it was never refuted that Mr. Cannon had a food truck in Michigan and the district court never said that Mr. Cannon lied about that food truck, and that's what he testified to, and for that reason, I don't think the obstruction should apply. He denied he was going to California for any drug-related purpose. Is that fair? It is fair, your honor. Meanwhile, there's all kinds of flight records and stuff that show him coordinating with Stovall or flying out there with Stovall. Is it fair for us to say, well, the district court might have had that in mind? It goes right, the food truck is not really sort of, that's just sort of ancillary to the whole case. I agree with you, your honor, except the district court did not make the required finding. It never pinpointed in what it said, and as I said, I just read it to you, what actually it was saying he obstructed justice on. If this court was to believe the government's case in its entirety and that everything was true that they alleged, then justice did occur with the guilty finding, if he were to believe that, assuming arguendo, and he couldn't have obstructed justice, so it would have been if he did that almost harmless, if you will. I see my time is up, your honor. Thank you. Thank you. Good morning. Parker Douglas on behalf of Mr. Mason. May it please the court. Mr. Mason rests on his briefs and the arguments of co-defense counsel with respect to all issues today, except for the issue of prosecutorial misconduct, which my client would like pressed, and so I will address that, and I'll reserve two minutes. There is some question in the briefing about what this is about, whether or not Mr. Stoball was saying false statements or statements that were contradictory to Mr. Farmer, Mr. Mims, but this isn't about that. This is about testimony that was elicited in a prior trial by the same prosecutor that is directly contrary to the testimony that was elicited in Mr. Mason's trial. I won't go over the sites again. I think they're particularly strong in the reply brief, but it does make clear that Mr. Stoball in the prior matter said,  four or five times that he did not have drugs on July 11th. It's not just that he didn't have drugs on that day. It's that he didn't have drugs to give to people who were the people who sold for him always after being told that they could sell it for three times what he was making in Michigan at that time. There is no objection along these lines at trial. There is not, Your Honor. I'm here on plain air of review, yes. So the question is whether the prosecutor knowingly put on or solicited, whatever, false testimony in this trial. That's correct, Your Honor. It's not about whether there was something false in a prior trial. No, and the contention is, as I've said in the briefs, that given the testimony in the prior trial, the prosecutor must have known that the testimony in this case was false. Well, I mean, you know, it's one of those, you know, he's either lying now or lying before things, but that doesn't mean necessarily he's lying now. I mean, why is the prior testimony so sacrosanct that we know that's true? Well, the prior testimony is sacrosanct for a couple of reasons. One, it also stood uncorrected by this prosecutor, so he must have assumed that that testimony is true. He also probed the issue in the farmer trial repeatedly about whether or not he had drugs on that day, and he said he did not. He never said in that case, I didn't, but I was reserving some, and that would be ridiculous for him to say after he's told he could make three times the amount if he gave it to the people who wanted it on that day to take to Atlanta. So was it brought out on this trial that this statement was in conflict, that Stovall had made previously? It was, Your Honor. I did cross-examine the witness on it, and that is true. And did Stovall have some kind of an explanation as to why he was testifying differently? He did have an explanation. He said that he wanted to hold some back because he would be giving it away to Farmer and Rims, but there's nothing in the record that Mr. Stovall ever gave anything away. As a matter of fact, repeatedly at the record sites that are shown in my brief, he repeatedly said that Mims and Farmer were sellers for him. He was never giving it away. He fronted them drugs so that they would sell for him to make a profit. Did you point this out in the cross-examination? I did, Your Honor, and in spite of what the prosecutor listed in the first case, he listed in this case on rebuttal, well, what's the real story here? And he said, didn't you want it so that you could make money that day? And he said yes. Is that a leading question? Anybody object to that? I objected to leading questions. I'm not sure if I objected on that one. Okay. So you weakened Stovall's testimony very much by what transpired in this trial. You were able to attack it, but your claim here is that there's prosecutorial misconduct. That's correct. And that that alone warrants a new trial? It does because this was material. It was the only evidence about what the drug organization had on July 12th. And why is that material? That's material because for count two, that was the day that was alleged that my client bought from Mr. Stovall, and that's what Mr. Stovall testified to, and that's the evidence that they had on that claim. So it's for a particular count. That's right. It's for count two. But I would argue that the jury was infected at that point, that it would be more likely to convict on the conspiracy count as well because this was, I think, the strongest evidence. In fact, the government said it was the best evidence of them having drugs on that day. Just to make sure, there was one question about time that the government brought up, saying that we couldn't show that it was on this day, but that's just not true. In the farmer transcript at page 408, the counsel for Mr. Farmer is referring to Exhibit 12, which is a call that took place on the 11th. Mr. President refers to the same exhibit when he's questioning him earlier in the farmer trial at page 347, line 24. So it's clear that we're talking about this day and this day only. Unless the court has more, I'll... Thank you. Thank you. It may please the court, just in presence of the United States, I tried the case below and also supervised the investigation. I'd like to begin where Mr. Summers' counsel focused his argument today, which is on the district court's discretionary determination to limit cross-examination of one of six cooperating defendants who testified at trial. Wasn't he the main one, though, Stovall? Your Honor, I would say he was the central figure in the government's investigation. The investigation started into the Stovall DTO, and because of that, his cooperation was able to touch every defendant at trial. I would say that our case was not built on Mr. Stovall's testimony. In fact, I think our case could have been proven without Mr. Stovall's testimony, because as a prosecutor, I think you run great risk if you were going to hang an entire prosecution on the testimony of a person like Mr. Stovall. And so in relying on his testimony, we made sure that the material portions of that testimony were corroborated by other evidence, and it was substantially corroborated. So he said, I took these trips out west, and sure enough, there are flight records showing that he took those trips out west. So did you identify Mr. Stovall as basically the head of the conspiracy? Was he at the top? Your Honor, this is not a disciplined, structured conspiracy like I think many of us, including me, think of them in terms of a traditional drug conspiracy. I'll say it was a more loose group of people who worked together to sell meth, and I would say Mr. Stovall was kind of the central conduit from these various sources out west into the southwest Michigan area. But I don't think he had the ability to control, for example, Mr. Cannon's supplier in California or Mr. Cannon or Mr. Summers. He didn't have the ability to control Mr. Dunn, so he wasn't giving those people orders. He did have local distributors who he controlled or ordered. But the point is that each of the significant aspects of his testimony were corroborated either by wire interceptions, text messages recovered from seized cell phones, business records like the rental car record that, taken together with text messages, showed that Mr. Braxton was using the 8138 number, the flight records. And then it was also corroborated by other cooperating defendants' testimony. So Mr. Summers and Mr. Stovall fly out west to order from Mr. Dunn. That's kind of how the conspiracy starts in 2016, and Mr. Dunn testifies. And contrary to the argument of co-counsel, Mr. Dunn's never locked up in the Nuevo County Jail with Mr. Stovall before he proffers. He's given a bond by a judge in the District of Arizona where he's represented, or I'm sorry, where he was arrested, and then he travels to Michigan to proffer with the government and testify in the grand jury all before he was ever remanded at the time of his plea, which was in 2019. And so there are independent corroboration of the significant portions of Mr. Stovall's testimony. And then the other thing this court, of course, has to look at is the substantial cross-examination that Mr. Stovall was subject to on a whole range of topics, including topics that go directly to bias. So he was cross-examined on his plea agreement with the government. He was cross-examined on the 5K motion he had received from the government prior to his testimony in this trial. He was cross-examined on the Rule 35 motion that he expected to receive in exchange for his testimony, which he, in fact, did receive. He was cross-examined on the government's suspicion, the agent's suspicion, early in the case that he may have ordered these two murders that Mr. Mims committed before he went on the run. So with all of those things, why was the potential cross-examination on the possession of child pornography on the phone a bridge too far in your estimation? I mean, I know that it was cited that this was for harassment or embarrassment purposes, but your office prosecutes child pornography possession cases all the time, don't they? Yes. What's the penalty range for simple possession of child pornography? Your Honor, I have not handled many of those cases, but I want to say possession is a zero to ten year. So anyway, why was this a bridge too far? Well, it was a bridge too far, Judge Donald, because of the cases that say that the district court has discretion to limit cross-examination into collateral matters. Some of the cases talk about it in terms of collateral matters. Some of them talk about it in terms of Rule 403. And so this area of testimony was different in kind from the issues that went directly to the drug conspiracy. Doesn't it go just like the plea agreement and the 5K motion and the others to show that Stovall was hoping that if he testifies, he'll be given favorable treatment on the child pornography charge, which has not been filed yet, but which will be a substantial charge if it is filed? Judge Moore, I don't think so because of all of those other areas of cross-examination. So I think what this court has to look at, whether it's under harmless error or under the district court's exercise of discretion, it's the marginal value of that cross-examination, the marginal probative value. Because you have all these other areas to cross-examine on, including on issues of bias, one more area, the valid probative value under 401 for that is going to be relatively small, whereas the risk of unfair prejudice or confusion of the issues or misleading the jury or inviting the jury to do something like jury nullification because they dislike the government or Mr. Stovall for this totally collateral matter, I think it makes the probative value significantly less, which allows the judge to make that 403 finding that it's substantially outweighed by the impermissible use. I thought that at trial, the jury was made aware that Stovall's conduct potentially made him subject to a life sentence. Am I just misremembering that? No, you're correct, Judge Koplewicz. That was argued at length, in fact. And so at the time Mr. Stovall agrees in principle to cooperate with the government, the First Step Act has not been passed. And he's been double-sopped, so he's facing mandatory life in prison. And really, even before he knew the penalties, the day he was arrested, he knew he was cooked and he gave up a lot of information before he had to be brought before the magistrate judge, talking about a number of people, including Mr. Summers and Mr. Braxton. So he knows he's cooked even before he knows the penalties, and I think he's probably made up his mind about what he was going to do if he ever got caught. But then he learns about the penalties, and he's been double-sopped pre-First Step Act, so he's facing mandatory life in prison. And that's when he agrees in principle to cooperate with the government. And so the penalties and the plea are a little bit lower because of the First Step Act, but it was obviously fair for defense counsel to cross-examine him and say, hey, you cooperated because you knew you were facing mandatory life. And that's to say nothing of, and defense counsel made this point too, repeatedly, that's to say nothing of the two homicides. The defense counsel brought up the two homicides? Oh, yes. Yeah, on cross-examination and in closing, repeatedly. And the government didn't move to limit that at all because that was clearly all fair game. But that's also part of the reason why I think the marginal probative value of this collateral matter is so minimal. Put another way, I think the defense theory here is that Mr. Stovall wouldn't have made up lies because their theory is that he was lying, but he wouldn't have made up lies only to save himself from a life sentence or only to get a 5K or only a Rule 35 or only to get favorable treatment on homicide issues, but he would have done it because of this other crime. And I think you have to just make a lot of assumptions to get there. You have to make a lot of assumptions about how he thinks. You have to make a lot of assumptions about, well, would he actually, pardon me, have been subject to a longer sentence? Would it have been consecutive or concurrent? If it were a state prosecution, how would that have affected it? And so you just have to, I think, assume too many things to think that that played a significant part in his calculus of the decisions that he was making. And for similar reasons, pardon me. It's always dangerous to drink. I mean, people always drop it and stuff. I've done that before, Judge Krupp, so I know how dangerous it can be. Be careful, man. All right, go ahead. So I think the court can also find harmless error for the same reasons, right? Because even if there's this, for the valid probative value, if there is valid probative value to this marginal line of cross-examination, it's not going to leave the jury with a significantly different impression of who Mr. Stoball is or why he's testifying, right? Can you address, moving to a different issue, can you address the concern about the conflicting testimony of Stoball regarding the July 11th or July 12th effort to sell drugs that was talked about in this Farmer case versus this case? Yes, Judge Warren, I appreciate the opportunity to do so. So I was the prosecutor in both of those trials who examined Mr. Stoball in both trials. And the first thing I think to say here just as background, and it shows up in the record repeatedly in both cases, is Mr. Stoball is not a good witness, right? He easily gets confused. He's hard to understand. He has to be constantly asked to repeat himself. Both defense counsel and the district judge made those remarks, and I think we also addressed it in closing. Difficult to understand. So in these wire cases, right, there are hundreds or thousands of interceptions, right? There's no one with perfect knowledge at any one time about what calls or texts were made on a given date. What we do when we're preparing for a trial is we say, well, let's have someone go through and call out the calls of these people. So for the Farmer trial, it was the calls between Mr. Stoball and Mr. Mims and Mr. Farmer. That sort of painted that picture, right? And some of those are from the July 11th time period. We have no qualms about the date issue that's being raised by Mr. Mason. So then for this trial, we pull the calls for the defendants here, including Mr. Mason, the calls between Mr. Stoball and Mr. Mason. And so when Mr. Stoball is being asked about the July 11th transaction at the Farmer trial, which was in May of 2019, so it's almost a year later, he's looking at the calls and he's saying, well, I told him I didn't have any. I told him, you know, that's what I'm saying. I must not have had any. We ran out all the time. That's what he said, right? Or I'm paraphrasing. But then you give him the opportunity to look at in the second trial, right, the calls and text messages he had with Mason around that time, and he says, oh, yeah, we must have had a little bit because there's a deal being set up, right? There are 13 separate wire interceptions related to that July 11th deal. And Mr. Mason does not address those in his brief because he wants to say this is all Stoball's testimony, but it's not. And the reason he doesn't is because there's no answer for what those 13 interceptions mean if there's no math, right? So the interceptions, some of them are short text messages, right? And I'm, again, paraphrasing from memory, but it's something like, you know, be up in the morning, or I'm on my way, or I'll be there in five minutes. Okay, I'm here. Come down, or something like that. And then there's one longer call that we cite in the statement of the case in our brief, right, where they're actually talking more explicitly about methamphetamine, right? And Mr. Stoball even says, I don't have a whole pee, right? I would have had it yesterday, but I'm running out now. I don't have a whole pee right now for you. And so Mr. Stoball's explanation in this trial is now having the benefit of reviewing all those calls together is, well, I thought I was running out, but I must have had a little bit, and I didn't want to give it to Mr. Mims. Why is that? Well, I think he didn't want to give it to Mr. Mims because, and this is me speculating now, but it's because he knew he was cooked. He knew, right, he's on the run for committing two murders, and he's probably a short timer, and Mr. Mims has, in fact, been convicted by the state for those homicides. But he feels some sort of familial obligation to, or friend-based obligation, to support him with money while he's on the run. But I think he thinks, if I send this mess down to him, it doesn't matter what it's selling for down in Atlanta. I'm never getting that money back, right? I'm never going to see the proceeds of it. Whereas if he does a deal with Mr. Mason, he gets the money right away. And did Stovall say this in his testimony, or is this you telling us now after the fact? Well, this is me, Judge Moore, I'd say, interpreting his testimony. I mean, his testimony itself was, I didn't want to sell it to Mims. I wanted to sell it to Mr. Mason because I'd get the money. And he said that at the trial. Right, yeah, I mean, I'm paraphrasing, but yes, he did say that. It's a difficult situation when you are both the prosecutor and now the lawyer on appeal to know what you're telling us off the record and what was on the record. So that's why I was trying to clarify that. Thank you, Judge Moore. I'm trying to stick closely to the record. But I'll say, just given Mr. Stovall's difficulty in communication, I'm sure he would not have put a number of the things I just said the way I said it. But if I can just try to paraphrase him very closely, I'd say at the trial in this case, he said that he sold it to Mr. Mason because he'd be able to turn a profit and he did not want to send it down south to Mr. Mims. And that lied to Mr. Mims about the fact that he didn't have it. And so your opponent is arguing that there was prosecutorial misconduct because of the conflict of the two statements, the one at the farmer's trial and the one here. And your response is that there is an explanation for the conflict in the statement. And my question is, and was the defense here given the opportunity to explore this conflict fully at this trial in terms of asking questions of Stovall, one would think, would be the way to explore them. Stovall has made two apparently conflicting statements under oath. Oh, yes, Judge Moore. It was explored extensively. I would say that was the primary line of cross-examination by Mr. Mason's counsel on Mr. Stovall, which I have to say was good work by him because when he brought up that line of cross-examination, it hadn't even occurred to me. I was surprised by him. I said, oh, that was a good find. Mr. Stovall is going to have to be able to answer that question. But this court's precedents make clear that prior inconsistent statements by themselves are not prosecutorial misconduct, right, unless it can be shown that the two statements or one of the statements is indisputably false. And that's just not what we have here. We have Mr. Stovall's faulty recollection, in part because he just wasn't presented with all of the data in front of him to be able to remember what happened a year or more before he was being asked the questions about it. You know, Mr. Stovall is a guy who sells meth like a lot of us breathe air, right? So he just doesn't have that recall of the specific days when there was meth in front of him. So, yeah, the first response is there's a way to show that those two pieces of testimony are not inconsistent. The second is that this court's case law makes clear that inconsistent testimony isn't enough for prosecutorial misconduct. And the third is I can assure the court that I just didn't know either at the time of the Farmer trial or on direct exam with Mr. Stovall that there was this inconsistency. I was caught flat-footed on it, and that's just because there are so many interceptions. Unless you've got them in front of you, it's just really hard to keep straight in a case like this. So I can turn to one more issue that I wanted to clear up, too. It's this issue of the jail calls and the discovery. So the jail calls were not Jenks material and never were Jenks material. And we were not sitting on these jail calls waiting to dump them on defense counsel, right? So the jail calls we obtained shortly before we produced them for three people, none of whom were government witnesses, and so it wasn't Jenks material, right? We obtained them for Mr. Braxton, Mr. Mason, and Mr. Campbell. You say shortly. How short is shortly? I don't recall off the top of my head Judge Moore, but it was probably a matter of days. And the reason we did... Did you retrieve them then, or the reason you decided to use them? We were never going to use them in our case in Chief. So what does the reason we did refer to? The reason we obtained them is because Special Agent Glenn was going to provide voice identification testimony with respect to the wire interceptions, okay? And we thought that the defense should have an opportunity to cross-examine him on that voice identification. And it was very unlikely, I thought, that they would do so, but the argument I was more concerned about appearing in front of this court and having to answer is why the defense did not even have the opportunity to test Agent Glenn's voice identification. So we were in trial mode, just like the defense was. We're sitting around thinking about, okay, how are we going to prove identification? And just like we don't want to rely solely on Mr. Stovall's testimony for any fact, we don't like to rely solely on any individual piece of evidence for voice identification. We want to prove it multiple ways. And one way that the government is allowed to prove voice identification is to have an agent listen to both voices and say, yeah, in my opinion, I think it's accurate. And so we were looking for recordings that the agent could listen to and compare them with the wiretap interceptions to say, I've heard recordings of Mr. Braxton, and in my opinion, I think that the caller of the 8138 number is Mr. Braxton. And one source that we could do that is the jail calls. So did the jail calls come into evidence in any way? Never. No. No. And did the defendants dispute the voice identifications that were made, either through cross-examination of Agent Glenn or any other way? Yes, they did. They refused to stipulate to voice identification as is their right, and then they cross-examined Agent Glenn on his voice identifications. I think they went into things like, well, you're not specially trained by the FBI to do this and other things like that, right? So they had an argument to make about it. But if I don't produce the recordings that Agent Glenn listened to, then on cross-examination they're going to say, well, what recordings did you listen to? And he's going to say, well, I listened to jail calls, which is going to draw an objection because it's going to inform the jury that the clients were in jail, right, and we wanted to avoid that prejudice. So that's part of the reason I thought that cross-examination was unlikely. And then they're going to say, judge, we don't have any jail calls. How can we possibly even have an opportunity to test Agent Glenn's voice identification? And so there was no need for them to ever listen to these thousands of jail calls, and if they thought they had to, they could have obtained their own process, either a subpoena from the court or a discovery request to the government, to obtain them earlier in the case. But when you produced them, were they organized in such a way that the ones that Glenn listened to were identified so that they could go narrowly to the ones that he listened to? No, Judge Donovan, I'll tell you why. I'm not even sure if I asked Agent Glenn which ones he listened to, but I thought the concern would be if we only produced a limited set. I just said get them all for these three people who are going to do voice identification. If you produced them all, though, you can always label them. I mean, that was my question. I understood that you produced them all. My concern is a more limited disclosure would then lead to an objection of, well, you've just cherry-picked the ones that most closely match the voice identification on the wiretap. You haven't given us a fair sample of all the different ways my client's or Mr. Campbell's voice can sound. And so as a prosecutor, when I'm thinking about discovery issues, if I have two options, either produce more or produce less, I almost always err on the side of producing more because I don't want to have to explain to a court why I provided a more limited disclosure. What I'm saying is there's a third option, which is produce the more and label. But you told me what you did, and that's it. No, just, John, I think your point's very well taken. And in retrospect, if I had to do it again, maybe I would have. I can also say that if defense counsel would have asked me, well, which ones did he listen to, I would have been more than happy to ask Agent Glenn and then identify them. I want to go to another area, unless my colleagues want to pursue this further, and that is on the issue of the obstruction of justice and the factual findings where there's an alleged error because the judge did not make appropriate factual findings on the obstruction of justice. Can you speak to that and tell me what were the findings, what was the language that the judge used that you believe satisfied that obstruction enhancement? So I think that Mr. McKenna accurately summarized for this court what the district judge's holding was, Chief Judge Yonker's holding was at sentencing, and it really focused on those two areas. One was, are you a meth dealer? And two is, did you provide pretextual reasons for how you made money, namely the food truck issue? And so while it's conceivable that there could have been more detailed findings on the record, I think this court can look at the record and can affirm based on the record as it stands, even though it's that case, I believe it's Dunigan, that the best practice is for the judge to go element by element, because there is that main conflict between Mr. Cannon getting on the stand and saying, I didn't sell methamphetamine, I was a marijuana and a lean dealer, and the fact that the jury found that he did sell methamphetamine and he was part of the conspiracy. So does that mean that any time the defendant testifies and the jury disagrees and finds him guilty that he's subject to that enhancement? No, it doesn't. I think it will often be the case that a defendant who testifies will be subject to the enhancement if convicted, because the defendant may have a story that is in direct conflict with the jury's finding. But I think it's possible in some cases, I could imagine cases, where a defendant might testify in a way that is not in direct conflict with the jury's verdict, in which case the enhancement wouldn't apply. But whether you sold meth or not is pretty black and white, and so that's why I think this court can affirm the court's holding there too. Just one other follow-up comment. I guess the reason that's troubling, if it chills the defendant's constitutional right, which is not to testify or the defendant's decision to testify, and you said that there's a likelihood of that happening, given what we've learned now through the various innocence projects across the country, that there are so many people who have been convicted and later on they've been found, for whatever reason, to not have been, I mean the jury may have gotten it wrong. So I'm concerned about chilling. That's just an observation. And I suppose I would agree with Your Honor's observation, because I think it's one of those things where actions have consequences, right? I mean it's tough to be a criminal defendant. You have to make some tough choices about whether you testify or whether you go to trial. And I think if you roll the dice and say, I'm going to give the jury an alternative narrative and see if they'll give me a walk, one thing you risk is the 3C1.1 enhancement. I think it's not a great concern here if you look what the judge did on 3553A factors, right? There's a significant downward variance all the way down to 20 years from I think the guidelines were 360 to life. And so there's not an explicit finding at sentencing that the sentence wouldn't have been different if he had found otherwise. So I don't think the court can rely on that issue to avoid the 3C1.1 issue. But I think as a practical matter, Chief Judge Yonker still looked at the full picture of Mr. Cannon settling on an appropriate sentence. Arguably, the district judge's statement was pretty bare bones here in terms of the perjury points. What is your best analogous case where this court has found that the fairly strict requirements for specificity on the perjury enhancement has been satisfied? It would show that this merits affirmance. Off the top of my head, Judge Moore, I don't have a great analogous case. I would point the court to that language. Again, I think it was Dunnegan that said, you know, the best practice is to go element by element. But I think that this court probably has affirmed in circumstances where that hasn't been strictly adhered to, though I don't recall off the top of my head if we cited those cases in our brief. Yeah, because it does seem to me that the district judge's full finding here is pretty much saying, you've testified, you've been convicted, and then he says, and you go even beyond that, and you're trying to articulate an alternative narrative to explain the evidence about the food truck business. There has to be an appropriate use of penalty for that. But that's, to me, that's all that the district judge said, which doesn't seem to be consistent with specificity requirements. I agree that was the focus of the district court's holding there, and so I think this court can look beyond that and can look at the actual testimony of Mr. Cannon and find that while it would have been better for the district judge to make more lengthy findings, it can affirm based on the fact that Mr. Cannon's testimony was clearly in conflict with the jury's verdict based on his participation in the conspiracy to distribute methamphetamine. I know your time is coming to a close, or I see the red light on now. Is there any other issue that you feel you need to respond to? No, Your Honor. I just ask that the court affirm the judgments of the district court. Thank you. Each of the appellants has two minutes for rebuttal, so it will go very quickly. Thank you. I just want to make three points. Point number one, counsel for the government emphasized that the defense are making lots of assumptions about what Stovall is thinking and what he would have testified to had the defendants been able to cross him on this bias issue. Fair enough. Van Aerstal says that this court has to indulge those assumptions. At page 684 of the court's opinion, the court says, Assuming the damaging potential of the Crawford cross-examination was fully realized, can the reviewing court say that the district court's error was harmless beyond a reasonable doubt? The Supreme Court itself has said you have to indulge assumptions. Point number two, counsel for the government emphasized that the district court has discretion on issues like this. The district court doesn't have discretion, however, to rely on an incorrect interpretation of the Constitution. Van Aerstal again says that a district court does not have discretion to totally bar cross-examination about events that concededly took place and which a reasonable jury could find furnished a witness a motive to shade or fabricate his testimony. A district court's discretion comes into play once the court allows some facts about the defense's theory to come in. There's no discretion when the district court allows no facts about events that concededly took place. Point number three, with respect to corroboration, counsel for the government emphasized that there was wiretap evidence, there were text messages, there was all this stuff, and as to Summers, that's simply not true. As I discussed earlier, there was limited testimony from Dunn and James. There were a handful of flight records, but the government didn't get Summers on a wire, had no text or relevant telephone communications with him, no controlled buys, no drug seized, no drug ledger seized, the case was thin, and without Stovall, the government couldn't approve the case. Thank you. In my last few minutes, I will say this. There's a lack of confidence in this overall trial because of the errors that we've all talked about today. In a Title III wiretap case where you're going to send my client to prison for a mandatory minimum of at least 15 years, based largely on the testimony of a man like Mr. Stovall, the jury needs to know about all of his incentives and it needs to have the defense have a fair shot at pointing out the nuanced evidence of his lies, of the lies of the secondary witnesses. I disagree significantly that the government could have proven its case without Stovall's testimony, and he was the type of witness who looked to the government to know what he was supposed to say, and there was a variety of ways in which he was prompted to say what he thought he needed to. He had the transcripts of these calls. He had a script when he went to the grand jury. He testified with something that had been written out for him. We need a minimal, fair chance at a good cross-examination, and we have to have a minimal amount of time to work with this material to be able to do it. All of the secondary witnesses were based on they relied on Mr. Stovall. They took their orders from him. They were housed together, and they had the government's criminal complaint about their theory of the case, and all of this was tied together, particularly in a case like a wiretap evidence case. The errors here are sufficiently significant that they require reversal. We cannot say for sure what a jury would have done if these errors were corrected, and I think it requires reversal in this case, particularly for my client, Jermaine Braxton. Thank you. Thank you. Thank you, Your Honors. The government mentioned, Your Honors, in their argument that what Mr. Cannon testified to was in conflict with what the jury found, and that's correct. That's what the jury decided. That doesn't mean you get punished again for it. I would submit that if you are constantly applying obstruction of justice, I would agree with Your Honor that that would create a chilling effect on testifying. Take it to an extreme example. What if it was a murder case, and he had asserted an affirmative defense of self-defense, and the jury disagreed? Does that mean he would then be assigned an obstruction of justice? I think the obstruction of justice should be a very narrow, narrowly tailored enhancement that is something specific like denying an identity or something that is blatant or a Social Security number or something like that, not your version of events. But, I mean, perjury is okay as to the elements of the offense, but it's not okay as to collateral matters? Is that the rule? I'm not suggesting perjury is ever okay. Of course it isn't. But I think that it has to be narrowly tailored to be something very specific and not just what a client remembers that happened or is telling something that's true. I'm going back to the food truck. It was never just proved that there wasn't a food truck, and that's what he talked about. No defendant is going to get on the stand and say, yes, I did, X, Y, and Z. And then finally, even if this court found he did do all that, the case law from this court, and I cited United States v. Roberts, is very clear about you have to make specific findings for each element of perjury that encompasses all the factual predicates. And what Your Honor, Judge Moore said is the court here simply said this is what he testified to. It's just about his testimony, nothing about actual perjury. Thank you. Thank you. Your Honors, I'll be brief. The government suggested that the testimony was conflicting. I would suggest, based on the sites that I've given you in my brief, that it's incommensurate. In the Farmer trial, the point of the questioning was to determine whether or not Mr. Stovall had any drugs to give to Mr. Farmer on that day. The same prosecutor elicited on five separate occasions, which I've noted here, that there were no drugs. He was confirming that. Farmer's counsel was confirming that. This was the status of what was known about what they possessed on July 11th. To state that somehow, after looking at more messages from Mr. Stovall's phone at the same time, when those were available to the government in the Farmer trial as well, is incredulous. The fact that they had the text messages to my client, and there were explanations for those messages. In those messages, my client is talking about genes. I put out an affirmative defense to show that he was a clothes manufacturer. They depended on Mr. Stovall's interpretation of what he was saying that day. And that's clear from what I've cited. I would say one more thing just about the disability of cross-examining Mr. Stovall on child sex matters. Yes, there was a life sentence in front of him. But what was also in front of him was at least a 15-year minimum mandatory on child pornography production. And he would be facing lifetime SORNA registration if that was brought against him. That was fair game to go after. And it's important to know that the things that he was avoiding are different in time from what he was otherwise facing. With that, thank you, Your Honors. Thank you. Thank you all for your argument. And I understand that all four defense attorneys are appointed pursuant to the Criminal Justice Act. And we thank you for your service to your clients and to the interest of justice. Thank you all for your argument. And the cases will be submitted. The clerk may call the next case.